IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-01413-PAB-GPG

STONE CREEK BUSINESS CENTER, LLLP, a Colorado limited liability limited partnership,

    Plaintiff,

v.

STONE CREEK–COLORADO, LLC, a Delaware limited liability company,
MIKHAIL KAMINSKI, an individual, and
CBRE, INC., a Delaware corporation,

    Defendants.

---

**ORDER**

---

This matter is before the Court on Defendant CBRE, Inc.'s Motion for Summary Judgment [Docket No. 92]. Plaintiff responded, Docket No. 102, and defendant CBRE, Inc. ("CBRE") replied. Docket No. 109. CBRE seeks summary judgment on plaintiff's breach-of-contract claim (10th claim) and unjust-enrichment claim (11th claim).

## I. BACKGROUND[1]

Stone Creek Business Center, LLLP ("plaintiff", "SCBC" or "Seller") is a Colorado company that owned commercial property in Avon, Colorado (the "Property"). Docket No. 92 at 3, ¶ 1. Lynn Murphy, the son of plaintiff's general partner, began to oversee plaintiff's business dealings and efforts to sell the Property after fall 2015. *Id.* at 4, ¶¶ 4–5. Murphy is a real estate broker in Wyoming and a licensed mortgage loan originator

---

[1] The following facts are undisputed unless otherwise noted.

in three states, including Colorado. *Id.*, ¶ 6.[2] Plaintiff did not employ Murphy in an official capacity, but he was authorized to act as plaintiff's representative. *Id.*, ¶ 7.

On June 5, 2017, plaintiff entered into an exclusive right-to-sell listing contract (the "Listing Agreement") with CBRE through CBRE brokers Paul Kluck and Daniel Close. *Id.* at 4–5, ¶ 8. CBRE is a commercial real estate brokerage company, not a law firm, *id.* at 5, ¶ 9, and plaintiff did not retain CBRE to serve as its attorney or to otherwise provide legal advice. *Id.*, ¶ 11.[3] The Listing Agreement stated that the Property would be listed between July 1, 2017 and June 30, 2018, and CBRE "would act as [S]eller's agent" in selling the Property. *Id.* at 4–5, ¶ 8. The Listing Agreement uses standard language that the Colorado Real Estate Commission (the "Commission") has approved. *Id.* at 5, ¶ 10. Throughout the transaction, Murphy was the only representative of plaintiff with whom CBRE dealt. Docket No. 102 at 8, ¶ 2.

Pursuant to the Listing Agreement, which was extended through July 15, 2018 on the same terms, plaintiff agreed to pay CBRE 6% of the gross purchase price of the Property. Docket No. 92 at 5–6 ¶¶ 12, 16. The Listing Agreement contains certain duties of CBRE, including:

> 5. BROKERAGE DUTIES. Brokerage Firm, acting through Broker, as . . . a Seller's Agent, must perform the following Uniform Duties when working with Seller:
> 5.1. Broker must exercise reasonable skill and care for Seller,

---

[2] Plaintiff purports to dispute this fact because it "implies" Murphy "had experience in commercial real estate." Docket No. 102 at 4, ¶ 6. The fact at issue, however, simply states that Murphy "has a background in real estate," which plaintiff does not deny. Thus, the facts in this paragraph are deemed admitted.

[3] Although plaintiff admits that it did not retain CBRE to serve as its attorney or to provide legal advice, plaintiff asserts that Close provided Murphy with legal advice through the transaction. Docket No. 102 at 5, ¶ 11. It is undisputed that plaintiff did not retain CBRE to serve as its attorney or to provide legal advice.

>> including, but not limited to the following:
> . . .
>> 5.1.3.  Disclosing to Seller adverse material facts actually known by Broker,
>> 5.1.4.  Advising Seller regarding the transaction and advising Seller to obtain expert advice as to material matters about which Broker knows but the specifics of which are beyond the expertise of Broker;
>> . . .
>> 5.1.6.  Keeping Seller fully informed regarding the transaction.
>> . . .
> 6. ADDITIONAL DUTIES OF SELLER'S AGENT . . . Broker is Seller's Agent, with the following additional duties:
>> 6.1.  Promoting the interests of Seller with the utmost good faith, loyalty and fidelity;
>> . . .
>> 6.3.  Counseling Seller as to any material benefits or risks of a transaction that are actually known by Broker.

*Id.*, ¶ 13.  Under the heading "**RECOMMENDATION OF LEGAL AND TAX COUNSEL**," the Listing Agreement states, "[b]y signing this document, Seller acknowledges that Broker has advised that this document has important legal consequences and has recommended consultation with legal and tax or other counsel before signing this Seller Listing Contract."  *Id.* at 6, ¶ 14.  Plaintiff, however, did not consult with an attorney before signing the Listing Agreement.  *Id.*, ¶ 15.

On February 13, 2017, plaintiff received an offer to sell the Property for $3,250,000 from Jim Comerford (the "Comerford Offer").  *Id.* at 6–7, ¶ 17.  The first page of the Comerford Offer, which was made through a standard-language form from the Commission, states, "**THIS FORM HAS IMPORTANT LEGAL CONSEQUENCES AND THE PARTIES SHOULD CONSULT LEGAL AND TAX OR OTHER COUNSEL BEFORE SIGNING.**"  *Id.*  When Murphy received the offer, he responded, in part, that he would need to review it with his attorney.  *Id.* at 7, ¶ 18.  Murphy, however, did not

3

have an attorney, and he never engaged one to review the Comerford Offer. *Id.*, ¶ 19. Although that offer fell through, CBRE continued to market the Property. *Id.*, ¶ 20.

On July 12, 2018, plaintiff contracted with K Capital for the purchase of the Property (the "Sales Contract") for $3,500,000. *Id.* at 8, ¶ 21. The Sales Contract used the Commission's standard language. *Id.*, ¶ 22. Murphy reviewed the Sales Contract and initialed it on each page. *Id.*, ¶ 23. The Sales Contract stated, in part: (1) "The printed portions of this form . . . have been approved by the . . . Commission"; (2) "**THIS FORM HAS IMPORTANT LEGAL CONSEQUENCES AND THE PARTIES SHOULD CONSULT LEGAL AND TAX OR OTHER COUNSEL BEFORE SIGNING**"; (3) "Contract provisions on financing and financing documents . . . should be prepared by a licensed Colorado attorney or licensed mortgage loan originator. Brokers should not prepare or advise the parties on the specifics of financing."; (4) "**RECOMMENDATION OF LEGAL AND TAX COUNSEL.** By signing this Contract, Buyer and Seller acknowledge that the respective broker has advised that this Contract has important legal consequences and has recommended the examination of title and consultation with legal and tax or other counsel before signing this Contract." *Id.* When it signed the Sales Contract, plaintiff knew that CBRE was not a law firm, *id.* at 9, ¶ 24, yet plaintiff did not retain a lawyer to advise plaintiff concerning the transaction. *Id.*, ¶ 25. Close also did not speak with an attorney for plaintiff during the transaction, but assumed that Murphy was consulting with one. Docket No. 102 at 9, ¶¶ 8–9.

After executing the Sales Contract, K Capital assigned its rights and obligations to defendant Stone Creek–Colorado, LLC ("SCC"), which was owned and managed by its single member, defendant Mikhail Kaminski. Docket No. 92 at 9, ¶ 26. As a

4

condition of the sale, SCC requested that plaintiff provide seller financing for $900,000 of the purchase price. *Id.*, ¶ 27.  The Sales Contract provided, "[i]f Seller is to provide Seller financing, this Contract is conditional upon Seller determining whether such financing is satisfactory to the Seller, including its payments, interest rate, terms, conditions, cost and compliance with the law.  Seller has the Right to terminate under § 25.1 on or before Seller of Private Financing Deadline, if such Seller financing is not satisfactory to the seller, in Seller's sole subjective discretion." *Id.*, ¶ 28.

On August 6, 2018, Kaminski sent Close the draft seller-carry documents (the "Original Seller Carry Documents"),[4] which Close then sent to Murphy. *Id.*, ¶ 29.  The Original Seller Carry Documents contained a draft Member Interest Pledge Agreement (the "MIPA"), under which SCC would grant plaintiff a "security interest in all [of Kaminski's] membership interests" in K Capital. *Id.* at 10, ¶ 30.  The MIPA did not mention any security interest in the Property itself as collateral for the seller carry-back, such as a deed of trust. *Id.*, ¶ 31.[5]  On August 29, 2018, the parties amended the Sales Contract to change the buyer entity from K Capital to SCC. *Id.*, ¶ 32.  On September 4, 2018, Close forwarded Murphy revised seller-financing documents, which Kaminski's lawyer drafted (the "Amended Seller Carry Documents"). *Id.*, ¶ 33.[6]  The Amended

---

[4] These documents memorialized the parties' agreement that plaintiff would provide SCC a loan for SCC's purchase of the Property, which SCC would repay with interest.

[5] Although plaintiff admits that "there was no mention in the draft MIPA [of] a deed of trust," plaintiff asserts that Murphy understood from CBRE's representations that the Property itself was collateral. Docket No. 102 at 6, ¶ 31.  It is undisputed that the MIPA did not mention a deed of trust as collateral.

[6] At some point, Close sent Murphy a text message that stated, "[i]n the seller carry docs you'll see that if he defaults with you, you become the sole owner of his

5

Seller Carry Documents included another version of the MIPA and a promissory note (the "Note"). *Id.* As with the Original Seller Carry Documents, the MIPA in the Amended Seller Carry Documents provided that SCC would grant plaintiff a security interest in all of Kaminski's membership interest in SCC. *Id.*, ¶ 34. The MIPA also provided that the security interest in SCC was collateral for the $900,000 Note. *Id.*, ¶ 35. The MIPA further provided that, in the event of default by SCC, plaintiff could exercise its right to effectively take over SCC, including by exercising voting rights and receiving distributions. *Id.*, ¶ 36.[7] As with the original, the MIPA in the Amended Seller Carry Documents did not reference any deed of trust on the property. *Id.*, ¶ 37. Instead, the Note provided that it was secured by a MIPA "encumbering 100% of the ownership interest" of SCC. *Id.* at 11, ¶ 38. Murphy, or his designee, reviewed the Amended Seller Carry Documents and provided edits on the Note to Close via email on September 5, 2018. *Id.*, ¶ 39.[8] The final version of the Note that the parties signed also stated that the Note was secured by a MIPA encumbering 100% of the ownership

---

entity and would take the property back. . . . Now the bank would still have debt on it but you would have essentially been paid to take it back so it works well." Docket No. 102 at 8, ¶ 3. Plaintiff believes that this message and "other communications" led plaintiff to believe that the Property itself was collateral for the Note, which CBRE argues is "immaterial" to whether it complied with its obligations under the Listing Agreement. Docket No. 109 at 4, ¶ 4.

[7] Plaintiff states that it denies this fact, but does not support its denial with a "**specific reference** to material in the record supporting the denial," which the Court's practice standards require. *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv. Because plaintiff has failed to support its denial, the Court deems this fact admitted.

[8] Plaintiff contends that this fact "implies Lynn Murphy alone reviewed" the documents. *See* Docket No. 102 at 7, ¶ 39. Plaintiff, however, ignores that the fact states "or his designee." This fact is therefore not disputed.

interest in SCC.  *Id.*, ¶ 40.  On September 7, 2018, Close sent Murphy an email with an affidavit, which affidavit stated that the seller "ha[s] received" $1,140,000 from [] Kaminski on behalf of [SCC]."  Docket No. 102 at 9, ¶¶ 13–14.  Plaintiff never consulted with an attorney concerning the seller-financing.  Docket No. 92 at 11, ¶ 41.[9]

The closing took place on September 12, 2018.  *Id.*, ¶ 42.[10]  Although SCC did not pay the $25,000 earnest money before closing, the $168,000 in escrow was released to plaintiff in November 2018.  Docket No. 102 at 9, ¶¶ 10, 12.  SCC, however, failed to make all payments after October 2018 and, on September 9, 2019, after the Note's maturity date and SCC's failure to make its final Note payment, plaintiff issued a notice of default.  Docket No. 92 at 11, ¶¶ 43–44.[11]  As of the date of CBRE's motion,

---

[9] Plaintiff purports to deny this fact by asserting that it "implies SCBC knew or was advised it should consult with an attorney."  Docket No. 102 at 7, ¶ 41.  Plaintiff's purported denial is not responsive, and it is undisputed that plaintiff did not consult an attorney.  Because this fact is undisputed, the Court deems it admitted.  Although plaintiff states that neither Close nor Kluck personally advised Murphy or plaintiff to retain an attorney, *id.* at 8, ¶ 6, which CBRE disputes, Docket No. 109 at 5, ¶ 6, plaintiff states that Close testified that he "orally advised" Murphy to retain an attorney, Docket No. 102 at 9, ¶ 7, which CBRE disputes without support.  Docket No. 109 at 5, ¶ 7.

[10] There were additional negotiations with Kaminski and SCC before the closing, and Kaminski proposed additional terms on September 10, 2018.  Docket No. 102 at 9–10, ¶¶ 16–18.  Close responded to Kaminski stating, in part, "the numbers are constantly changing, the details are changing from what was originally discussed, earnest money was never deposited, . . . we have never had a transaction occur with so many last minute details changing and the issues mentioned above."  *Id.* at 9–10, ¶ 17.  Close then emailed Kluck, "[t]his is over my head.  Trying to wrap my head around what they are doing."  *Id.* at 9, ¶ 16.  On the day of closing, Close sent Murphy an amendment to the contract (the "Third Amendment to the Contract") with an email that stated, in part, "[t]his document is stating that if the escrow funds are still in the account after nine months, the amount left goest [sic] to the lender.  I do not see an issue with this because we have the other email stating he's going to release them by the 28th of September."  *Id.* at 10, ¶ 20.  The Third Amendment to the Contract states, "[a]ll references to Seller Financing are removed from the Purchase Agreement."  *Id.*, ¶ 21.

[11] Plaintiff argues that it is disputed whether SCC's failure to make interest-only

7

the Note had not been paid, and plaintiff has not sought to foreclose on SCC's membership interest under the MIPA.  *Id.* at 12, ¶¶ 45–46.[12]

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving

---

payments after October 2018 "resulted in an actionable default."  Docket No. 102 at 7, ¶ 44.  CBRE, however, does not state that the default was "actionable."  *See* Docket No. 92 at 11, ¶ 44.  It is undisputed that plaintiff issued a notice of default.

[12] Plaintiff states that it was "not in a position to foreclose on SCC's membership interest" until after September 9, 2019, by which time foreclosure "was not practical."  Docket No. 102 at 7–8, ¶ 46.  It is undisputed that plaintiff has not sought to foreclose on SCC's membership interest.

party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III. ANALYSIS[13]

CBRE seeks summary judgment on plaintiff's breach of contract and unjust enrichment claims. Docket No. 92 at 12–20.

### A. Breach of Contract

In Colorado, "a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted). There is no dispute that the Listing Agreement is a valid contract. Docket No. 102 at 11. Moreover, although plaintiff asserts that "[t]here are facts relating to the second element . . . that appear to

---

[13] Because the parties invoke Colorado law, the Court applies Colorado law in resolving the motion. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption").

be in dispute," *id.*, which would actually undercut plaintiff's claim, plaintiff does not explain what those disputed facts are and does not otherwise elaborate on why plaintiff believes it may have failed to perform. The Court therefore finds no genuine dispute of material fact as to the first two elements of this claim.

Plaintiff contends that CBRE breached the Listing Agreement by (a) failing to advise plaintiff to obtain legal or tax counsel; (b) failing to keep plaintiff fully informed regarding the transaction; (c) failing to promote plaintiff's interest with good faith, loyalty, and fidelity; and (d) failing to counsel plaintiff as to material risks that CBRE knew or should have known. Docket No. 35 at 15–16. CBRE responds that it is undisputed that CBRE provided plaintiff with conspicuous written warnings that the sale of the Property would have serious financial and legal consequences and that plaintiff should consult an attorney. Docket No. 92 at 14–18. CBRE also argues that it timely provided documents and all material information about the transaction to plaintiff, and that plaintiff could have rejected the seller-financing in its sole discretion if it did not find the financing terms satisfactory. *Id.*

It is undisputed that Murphy signed the Listing Agreement as plaintiff's representative and that the Listing Agreement stated, in part, "[b]y signing this document, Seller acknowledges that Broker has advised that this document has important legal consequences and has recommended consultation with legal and tax or other counsel before signing this Seller Listing Contract." *Id.* at 6, ¶ 14. Additionally, in the context of the Comerford Offer, plaintiff was informed to "consult legal and tax or other counsel." *Id.* at 6–7, ¶ 17. Murphy told CBRE that he would need to review the Comerford Offer with his attorney, indicating that he understood CBRE's advice to retain

10

counsel. *Id.* at 7, ¶ 18.  The undisputed facts therefore show that Murphy knew that CBRE was not acting as plaintiff's legal or tax counsel, *id.* at 9, ¶ 24, and that Murphy would need to consult with experts.  The Sales Contract with SCC further provided multiple warnings to plaintiff to consult legal and tax or other counsel.  *See id.* at 8, ¶¶ 22–23.  Moreover, even if it is disputed whether Close or Kluck orally advised plaintiff to consult an attorney, *see* Docket No. 102-6 at 2–3, ¶¶ 4–5, there is no genuine dispute of material fact that CBRE advised plaintiff to seek legal advice in connection with the transaction.

Plaintiff asserts that CBRE provided legal advice regarding matters beyond CBRE's expertise, which the Listing Agreement forbade, when Close sent Murphy a text message stating, "[i]n the seller carry docs you'll see that if he defaults with you, you become the sole owner of his entity and would take the property back. . . .  Now the bank would still have debt on it but you would have essentially been paid to take it back so it works well."  Docket No. 102 at 12 (quoting Docket No. 102-4 at 4–5).  Plaintiff asserts that Close's message, in addition to being legal advice, was an inaccurate description of the terms of the Sales Contract with SCC.  *Id.*  Plaintiff, however, does not explain why this message was inaccurate, and it is undisputed that, pursuant to the MIPA, plaintiff had a security interest in SCC, which owned the Property, and that, in the event of default, plaintiff could take control of SCC, which would own the Property. Docket No. 92 at 10, ¶ 34.

Plaintiff's argument is also contradictory.  It both argues that CBRE breached the Listing Agreement by failing to keep plaintiff fully informed regarding the transaction and that CBRE breached its contractual duties under Section 5.1.4 of the Listing Agreement

11

when Close provided this text-message explanation to Murphy.  *See* Docket No. 102 at 13.  That provision of the Listing Agreement requires the broker to exercise "reasonable skill and care" in "[a]dvising Seller regarding the transaction and advising Seller to obtain expert advice as to material matters about which Broker knows but the specifics of which are beyond the expertise of Broker."  Docket No. 92 at 5–6, ¶ 13.  It does not explicitly prohibit a broker from explaining the terms of a proposed agreement.  Regardless, this one message is insufficient to constitute a genuine issue of material fact in CBRE's compliance with its duties under the Listing Agreement.  First, the Colorado Supreme Court has long held that real estate brokers who "select, prepare and explain" documents like "receipts and options, deeds, promissory notes, deeds of trust, mortgages, releases of encumbrances, leases, notice terminating tenancies, [and] demands to pay rent or vacate," "at the request of their customers, without charge other than the usual broker's commission, and only in connection with real estate transactions then being handled by them" are not engaging in the unauthorized practice of law.  *See Conway-Bogue Realty Inv. Co. v. Denver Bar Ass'n*, 312 P.2d 998, 1004–06 (1957).  Second, it is the Sales Contract, to which CBRE was not a party, not the Listing Agreement, that states that brokers should not prepare or advise parties on the specifics of financing.  *See* Docket No. 92 at 8, ¶ 23.  That clause's inclusion in the Sales Contract, rather than the Listing Agreement, likely serves to warn buyers and sellers against relying on brokers for advice on subjects that may be more appropriate for a lawyer.[14]

---

[14] Plaintiff also argues that CBRE breached the Sales Contract.  Docket No. 102 at 13 ("In spite of CBRE's assertion that it 'has never held itself out to be, a law firm', CBRE indeed provided such advice during the course of its representation of SCBC, in

A reasonable jury could not find that Close's description of the Third Amendment to the Contract exceeds the bounds of what the Colorado Supreme Court permits of brokers.  *See* Docket No. 102 at 10, ¶ 20; *see Conway-Bogue*, 312 P.2d at 1004–06. This is especially true given the multiple warnings to plaintiff to hire a lawyer or a tax professional and Close's assumption that Murphy had a lawyer because Murphy stated that he would review the Comerford Offer with his attorney.  Thus, Close's explanations to Murphy are not sufficient to establish a factual issue with CBRE's alleged breach of the Listing Agreement.[15]

The undisputed facts also show that Close consistently provided relevant documents to plaintiff.  For instance, on August 6, 2018, after Kaminski sent Close the draft Original Seller Carry Documents, Close sent those to Murphy for review.  Docket No. 92 at 9, ¶ 29.  Close sent Murphy the Amended Seller Carry Documents, *id.* at 10, ¶ 33, and the Third Amendment to the Contract.  Docket No. 102 at 10, ¶ 20.

Plaintiff argues that CBRE failed to inform it "regarding the risks of involving a

---

violation of . . . Section 4.7 of the Sales Contract.").  CBRE was not a party to the Sales Contract, however, and only a party to a contract may enforce its terms.  *See Forest City Stapleton, Inc. v. Rogers*, 393 P.3d 487, 490 (Colo. 2017) ("Privity of contract between parties has long been a touchstone of contract causes of action.  Stated simply, privity of contract requires that one must be a party to the contract to enforce a term in the contract or an implied warranty arising out of the contract.").

[15] Plaintiff argues that it is disputed whether Close was qualified or experienced enough to provide brokerage services to plaintiff.  Docket No. 102 at 12–13.  Plaintiff, however, provides no facts, disputed or undisputed, on this issue, and there is no claim in the complaint about this theory.  The Court's practice standards require that if the non-moving party believes that there are disputed facts that preclude summary judgment, the party shall, "in a separate section of the party's brief styled 'Statement of Additional Disputed Facts,' set forth . . . each additional, material disputed fact which undercuts movant's claim that it is entitled to judgment as a matter of law."  Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.v.

seller carry on a transaction." *Id.* at 14.  It is undisputed that CBRE was not acting as plaintiff's legal or tax advisor, that the Listing Agreement advised plaintiff to retain legal or tax counsel, and that plaintiff knew from the Sales Contract that it should not rely on a broker's advice on the specifics of financing.  Docket No. 92 at 8, ¶ 23.  Although these undisputed facts do not negate CBRE's duty under the Listing Agreement to counsel plaintiff as to "any material benefits or risks of a transaction that are actually known by Broker," *see id.* at 5–6, ¶ 13, it is undisputed that the Third Amendment to the Contract removed all references to seller financing from the Purchase Agreement.  Docket No. 102 at 10, ¶ 21.  Given that there was no seller financing in the ultimate agreement, plaintiff fails to show how a jury could find CBRE's purported nondisclosure of possible risks of seller financing could breach the Listing Agreement's requirement to counsel plaintiff about all "material . . . risks . . . actually known" to CBRE.  Moreover, the undisputed facts also establish that the Sales Contract advised plaintiff that financing documents should be prepared by a licensed Colorado attorney or mortgage loan originator, *see id.*, ¶ 23, such as Murphy, and that Close assumed that Murphy had a lawyer based on Murphy's past representations.  *See* Docket No. 102 at 9, ¶ 9; Docket No. 92 at 7, ¶ 18.

　　 Next, plaintiff argues that Close failed to notice that the earnest money was never paid.  Docket No. 102 at 14.  It is undisputed that SCC did not pay the $25,000 in earnest money and that Close first learned about this on August 23, 2018.  Docket No. 102 at 9, ¶¶ 10–11.  Plaintiff, however, provides no facts, disputed or undisputed, regarding when the earnest money was due or when or whether Close notified plaintiff of the issue.  This issue, therefore, is not a "genuine" issue because it could not lead a

14

reasonable jury to find for plaintiff, *see Allen*, 119 F.3d at 839, as plaintiff has not provided facts on which to base even an inference of CBRE's breach of the Listing Agreement based on SCC's failure to pay the earnest money. *See Bausman*, 252 F.3d at 1115.

Plaintiff argues that CBRE failed to "go over the details of the seller's statement" with plaintiff. Docket No. 102 at 15. Although plaintiff identifies no facts about the seller's settlement statement and no requirement in the Listing Agreement that CBRE review the settlement statement line-by-line with a seller, it is undisputed that the Listing Agreement required CBRE to advise plaintiff "regarding the transaction" and keep plaintiff "fully informed regarding the transaction." Docket No. 92 at 5–6, ¶ 13. A reasonable jury could find CBRE's failure to review the seller's statement with plaintiff breached these provisions of the Listing Agreement. The Listing Agreement's warnings for plaintiff to review the transaction with a legal and tax counsel do not negate CBRE's other duties under the Listing Agreement.

Finally, plaintiff argues that CBRE failed to promote plaintiff's interest with the utmost good faith, loyalty, and fidelity. Docket No. 102 at 16–18. Plaintiff contends that Close did not disclose to Murphy that (a) Close had communicated with Kaminski about new terms that Kaminski proposed on September 10, 2018, or (b) Close had "concerns" regarding the transaction. *Id.* at 16. Although labeled as issues of CBRE's compliance with the Listing Agreement's requirement to promote plaintiff's interests, plaintiff identifies no facts calling into dispute whether CBRE promoted plaintiff's interests. Rather, plaintiff's two concerns relate to CBRE's duties to disclose to plaintiff adverse material facts and advise plaintiff regarding the transaction. Summary judgment is

inappropriate on these issues.  First, it is disputed whether Close and Murphy "talked about the unusual scenario."  *See* Docket No. 102 at 9–10, ¶¶ 17–19; Docket No. 109 at 6–7, ¶¶ 16–19.  CBRE had an obligation under the Listing Agreement to disclose to plaintiff adverse material facts and to keep plaintiff fully informed regarding the transaction and to disclose.  Docket No. 92 at 5–6, ¶ 13.  A reasonable jury could find that, by not informing plaintiff about his "concerns," Close did not keep plaintiff fully informed as the Listing Agreement required.  Moreover, although plaintiff provides no fact, disputed or undisputed, or argument that any of Kaminski's terms made it into the final agreement, *see generally* Docket No. 102, Kaminski's last-minute emails with Close may have been red flags that were material to plaintiff, especially given Close's disclosure to Kluck, his co-worker, that the transaction was "over [Close's] head," *id.* at 9, ¶ 16, and that plaintiff had the "sole subjective discretion" to terminate the Sales Contract if the financing was not satisfactory.  *Id.*, ¶ 28.

Plaintiff's burden at summary judgment, as the non-moving party with the ultimate burden of persuasion at trial, is to establish at least an inference of each element of its case.  *Bausman*, 252 F.3d at 1115.  Plaintiff has met that burden on the issue of whether CBRE complied with its duties under the Listing Agreement to keep plaintiff fully informed and to disclose to plaintiff material adverse facts.  The Court does not reach the issue of damages.  Accordingly, the Court will grant in part and deny in part the portion of CBRE's motion directed to plaintiff's breach-of-contract claim.

### B.  Unjust Enrichment

CBRE seeks summary judgment on plaintiff's unjust enrichment claim.  Docket No. 92 at 19–20.  Unjust enrichment is a "claim in quasi-contract for money damages

based upon principles of restitution." *DCB Const. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 118 (Colo. 1998). To state a claim for unjust enrichment in Colorado, a plaintiff must show that, "(1) at plaintiff's expense, (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).

Although a plaintiff may *plead* claims for breach of contract and unjust enrichment in the alternative, as the Court noted in denying SCC and Kaminski's motion to dismiss, *see* Docket No. 61 at 18–21, "a party cannot *recover* for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003) (emphasis added); *see also W. Ridge Grp., LLC v. First Tr. Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished) (same). There are two exceptions to this rule. "First, a party can recover on a quasi-contract when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract." *Interbank*, 77 P.3d at 816. "Second, a party can recover on a quasi-contract when the party will have no right under an enforceable contract." *Id.* (quotation marks and citation omitted). "For example, quasi-contractual recovery may be allowed when an express contract failed or was rescinded." *Id.*

Neither of these exceptions applies. First, plaintiff provides no facts or argument that the parties had a quasi-contract or an implied contract that covered conduct outside of the Listing Agreement, and the only conduct plaintiff complains of is CBRE's alleged failure to comply with the Listing Agreement itself. Second, plaintiff states that "the

17

validity of the Contract," presumably the Listing Agreement, "is now undisputed." Docket No. 102 at 19.  Moreover, in the context of the breach-of-contract claim, plaintiff stated, "[t]he first element above, that the Listing Agreement is a binding agreement, has been established and is not disputed."  *Id.* at 11.

Plaintiff argues that *Interbank* is "distinguishable" because plaintiff pled its unjust enrichment claim in the alternative.  *Id.* at 19.  Plaintiff's argument is not convincing. There is no indication in *Interbank* – or cases applying it – that it would not apply if a plaintiff pled its breach of contract and unjust enrichment claims in the alternative.  The court in *Interbank* held the exact opposite.  As this Court noted, *Interbank* specifically "rejected this argument, holding that '[a]lternative pleading . . . does not limit the principle that an express contract precludes an implied contract on the same subject matter.'"  *Echostar Satellite, L.L.C. v. Splash Media Partners, L.P.*, No. 07-cv-02611-PAB-BNB, 2010 WL 3873282, at *8 (D. Colo. Sept. 29, 2010) (granting summary judgment to defendant on plaintiff's unjust enrichment claim (quoting *Interbank*, 77 P.3d at 817)).  As in *Echostar*, "the fact that [plaintiff's] breach of contract claim may fail does not allow [it] to plead unjust enrichment in the alternative."  *Id.*; *see also W. Ridge Grp.*, 414 F. App'x at 120 (Unjust enrichment "is a remedy designed for circumstances in which other remedies are unavailable.  As such, it is not available as a mere alternative legal theory when the subject is covered by an express contract.").  The Court will therefore grant CBRE's motion and will dismiss plaintiff's unjust enrichment claim.

**IV. CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that CBRE, Inc.'s Motion for Summary Judgment [Docket No. 92] is

**GRANTED in part and DENIED in part**.  It is further

ORDERED that the plaintiff's claim against defendant CBRE, Inc. for breach of contract is **GRANTED in part** and **DENIED in part**.  It is further

ORDERED that plaintiff's claim against defendant CBRE, Inc. for unjust enrichment is **DISMISSED with prejudice**.


DATED September 23, 2022.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge