IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-01413-PAB-GPG

STONE CREEK BUSINESS CENTER, LLLP, a Colorado limited liability limited
partnership,

      Plaintiff,

v.

STONE CREEK–COLORADO, LLC, a Delaware limited liability company, and
CBRE, Inc.,

      Defendants.

_____

**ORDER**
_____

This matter is before the Court on (1) Defendant CBRE, Inc.'s Motion to Exclude

Expert Testimony of Craig B. Rathbun [Docket No. 106]; (2) Defendants Stone Creek–

Colorado, LLC and Mikhail Kaminski's Motion to Disqualify the Plaintiff's Expert Craig

Rathbun Pursuant to Fed. R. Evid. 702 and Fed. R. Evid. 703 [Docket No. 108]; and (3)

Defendants Stone Creek–Colorado, LLC and Mikhail Kaminski's First Amended Motion

to Disqualify the Plaintiff's Expert Robert Neirynck Pursuant to Fed. R. Evid. 702 and

Fed. R. Evid. 703 [Docket No. 110].  Plaintiff responded to the three motions, Docket

Nos. 111, 112, 113, respectively, and defendants CBRE, Inc. ("CBRE") and Stone

Creek–Colorado, LLC ("SCC") replied.  Docket Nos. 116, 115, 114, respectively.

**I.  BACKGROUND**

The Court assumes the parties' familiarity with this dispute and will not repeat the

background facts or procedural history except as necessary to resolve this motion.

Additional background can be found in previous orders.  *See, e.g.*, Docket Nos. 61, 120, 121.

Plaintiff owned certain commercial property (the "Property") in Avon, Colorado, which it sold to K Capital, LLC ("K Capital").  *See* Docket No. 120 at 1.  K Capital assigned its rights and obligations to defendant SCC, which was owned and managed by its single member, former defendant Mikhail Kaminski.  *Id.*  Plaintiff and SCC entered into a number of agreements regarding the purchase of the Property.  *Id.*  SCC failed to make certain payments pursuant to one of the agreements.  *Id.*

Plaintiff's complaint states eleven claims for relief: (1) alter ego, (2) breach of the promissory note against SCC and Kaminski, (3) fraud and misrepresentation against SCC and Kaminski, (4) breach of the covenant of good faith and fair dealing against SCC and Kaminski, (5) unjust enrichment against SCC and Kaminski, (6) and (7) declaratory judgment against SCC, Kaminski, and former defendant Prescient Capital Partners, Ltd., (8) promissory estoppel against SCC and Kaminski, (9) bad check against SCC, (10) breach of contract against CBRE, Inc. ("CBRE"), (11) unjust enrichment against CBRE.  *See generally* Docket No. 35.  The Court dismissed plaintiff's first, third, fourth, sixth, and seventh claims against both SCC and Kaminski and plaintiff's second claim against Kaminski only.  *See generally* Docket No. 61.  The Court granted CBRE's motion for summary judgment in part and dismissed part of plaintiff's tenth and all of plaintiff's eleventh claims.  *See generally* Docket No. 120.  Finally, the Court granted SCC and Kaminski's motion for summary judgment and dismissed plaintiff's fifth and eighth claims.  *See generally* Docket No. 121.  Thus, plaintiff's only remaining claims are (1) the portion of plaintiff's breach-of-contract claim

against CBRE regarding CBRE's duty under the Listing Agreement to keep plaintiff fully informed and to disclose to plaintiff material adverse facts, and (2) plaintiff's claim for breach of the promissory note and bad check against SCC.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the proffered opinions must be assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

In ruling on a Rule 702 motion, the district court has a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  To perform that function, a court must "assess the reasoning and methodology underlying the expert's

opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). Where an expert witness relies on experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes). When examining an expert's method, however, the inquiry should not be aimed at the "exhaustive search for cosmic understanding but for the particularized resolution of legal disputes." *Daubert*, 509 U.S. at 597. It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant.

In addition to the witness having appropriate qualifications and methods, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008). "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City & Cnty. of Denver*, No. 10-cv-00290-WJM-MJW, 2011

WL 2173997, at *3 (D. Colo. June 2, 2011); the proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F. Supp. 2d at 1221.

Assuming the standard for reliability is met, the Court must ensure that the proffered testimony will assist the trier of fact.  *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122–23 (10th Cir. 2006).  "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'"  *Id.* at 476–77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

## III.  ANALYSIS

### A.  CBRE's Motion to Exclude Testimony of Craig Rathbun

CBRE moves to exclude the testimony of Craig Rathbun, a real estate broker in Colorado, who is plaintiff's "commercial real estate and brokerage services expert."  *See generally* Docket No. 106 (quoting Docket No. 106-1 at 3–4); Docket No. 106-6 at 2. Rathbun was designated to offer his opinions that CBRE "breached its duties under the Listing Agreement and failed to adhere to the Colorado Association of Realtors Code of Ethics or the National Association of Realtors Standards of Practice in its representation

of [p]laintiff throughout the listing and sale of the Property."  Docket No. 106-1at 3.

CBRE moves to exclude Rathbun's opinions that "exceed the scope of his

qualifications, employ unreliable methodology, and that will be unhelpful to the jury."

Docket No. 106 at 2.  Rathbun provided an initial report, Docket No. 106-2, a rebuttal

report in response to an expert that plaintiff disclosed, Docket No. 106-3, and a

supplemental report.  Docket No. 106-4.  Rathbun was also deposed.  Docket No. 106-

7.

### 1.  *Rathbun's Qualifications*

CBRE argues that Rathbun is not qualified to provide certain opinions.  Docket

No. 106 at 4–5.  Under Rule 702, an expert's qualifications may derive from knowledge,

skill, experience, training, or education.  *See Gould v. Union Pac. R.R. Co.*, No. 19-cv-

02326-PAB-NRN, 2021 WL 4428286, at *3–4 (D. Colo. Sept. 27, 2021).  "[A]s long as

an expert stays within the reasonable confines of his subject area, our case law

establishes a lack of specialization does not affect the admissibility of the expert

opinion, but only its weight."  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965,

970 (10th Cir. 2001) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th

Cir. 1996)) (quotations and alterations omitted); *see also Zuchowicz v. United States*,

140 F.3d 381, 387 (2d Cir. 1998) ("[D]isputes as to the strength of his credentials, faults

in his use of differential etiology as a methodology, or lack of textual authority for his

opinion, go to the weight, not the admissibility of his testimony.").  Furthermore, "Rule

702 does not impose an 'overly rigorous' requirement of expertise, recognizing that

specialized knowledge may be acquired through a broad range of experience, skills or

training."  *Gould*, 2021 WL 4428286, at *4 (quoting *Squires ex rel. Squires v. Goodwin*,

829 F. Supp. 2d 1041, 1048 (D. Colo. 2011).  A court "should not exclude expert

testimony simply because the court feels that the proffered witness is not the most

qualified or does not have the specialization considered most appropriate by the court."

*Id.* (quoting *Squires*, 829 F. Supp. 3d at 1048).

CBRE identifies six opinions that it argues Rathbun is not qualified to provide.

Docket No. 106 at 4–5.  CBRE argues that Rathbun may not (1) opine that CBRE

"aided the [b]uyer in stealing from the sellers in a scheme that is as old as real estate

itself," *id.* at 5 (quoting Docket No. 106-3 at 4); (2) opine that plaintiff was "taken

advantage of and manipulated" because the "membership pledge in this matter was a

ruse," *id.* (quoting Docket No. 106-3 at 4); or (3) characterize the transaction was a

"con" or use the word "steal" or "scheme."  *Id.* (quoting Docket No. 106-7 at 8–9,

309:25–310:23; Docket No. 106-3 at 4).  CBRE also argues that Rathbun is not

qualified to offer "opinions as to what the law is and whether it has been broken,"

including opinions that (4) CBRE's conduct constituted "negligence"; (5) CBRE

committed "gross violations"; or (6) SCC as the buyer was in "default."  *Id.*

Rathbun's biography states that he has worked in real estate since 1973.  Docket

No. 106-6 at 2.  Rathbun states that he has handled "land planning and development,

financing and construction management, investment sales, and site selection, . . .

acquiring investment real estate and commercial leasing" in Colorado for 17 years.  *Id.*

He owned and managed the "number one commercial firm in the market."  *Id.*

Rathbun's CV reflects, among other things, that he has completed more than 250

commercial real estate transactions since 1987, totaling more than $100,000,000 in

value, completed 1,500 "lease transaction[s]" since 1987, and has co-taught a

continuing legal education course on commercial lease negotiation.  Docket No. 106-5 at 3.

CBRE argues that Rathbun is not qualified to offer any of these six opinions because, although Rathbun had a "Certified Commercial Investment Member" designation within the National Association of Realtors ("NAR") between 1992 and 2020, he does not have any other education or accreditation.  Docket No. 106 at 4. CBRE argues that Rathbun is "not [a] certified fraud examiner, CPA, or valuation expert" and does not have any legal training.  *Id.*

The Court agrees that Rathbun would not be qualified to opine on accounting issues since he is not a CPA or valuation expert.  The Court also finds that opinions (1), (2), and (3) interject concepts of fraud that are based on Rathbun's personal views. These opinions are not relevant to the question of whether CBRE breached the Listing Agreement and, in any event, they are excludable under Rule 403 as being unduly prejudicial.

Opinions (4), (5), and (6) are that CBRE was negligent and committed gross violations and that SCC was in default.  *See* Docket No. 106 at 4–6.  First, CBRE is correct that an opinion that CBRE was negligent is a legal opinion, yet Rathbun has no legal training.  Regardless of Rathbun's lack of qualifications, however, plaintiff has no negligence claim against CBRE.  An opinion that CBRE was negligent, therefore, is not relevant to any issue in this case and cannot "assist the trier of fact to understand or determine a fact in issue."  *See United States v. Muldrow*, 19 F.3d 1332, 1337 (10th Cir. 1994); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (noting that the relevance inquiry involves a consideration of "whether proposed

testimony is sufficiently relevant to the task at hand" (quotation and citation omitted));
*United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) ("Relevant expert testimony
must logically advance a material aspect of the case . . . and be sufficiently tied to the
facts of the case that it will aid the jury in resolving a factual dispute." (quotation,
brackets, and citation omitted)).  Accordingly, Rathbun may not opine that CBRE was
negligent.

Rathbun's "gross violations" opinion is that CBRE violated the Colorado
Association of Realtors Code of Ethics ("CAR Standards"), the NAR Standards of
Practice ("NAR Standards"), and the Listing Agreement, which it entered into with
plaintiff.  Docket No. 106-2.  Although Rathbun has substantial experience in
commercial real estate in Colorado, and although the Listing Agreement was at least
partially based on standard language approved by the Colorado Real Estate
Commission, *see* Docket No. 120 at 2, an opinion that CBRE violated the Listing
Agreement answers the precise question that the jury will have to decide.

Federal Rule of Evidence 704(a) allows an expert witness to testify in the form of
an opinion or inference even if that opinion or inference embraces an ultimate issue to
be determined by the trier of fact.  *See, e.g.*, *Gianfrancisco v. Excelsior Youth Centers,
Inc.*, No. 10-cv-00991-PAB-KMT, 2012 WL 2890916, at *3 (D. Colo. July 16, 2012);
*United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008).  However, "an expert
may not simply tell the jury what result it should reach without providing any explanation
of the criteria on which that opinion is based or any means by which the jury can
exercise independent judgment."  *United States v. Dazey*, 403 F.3d 1147, 1171 (10th
Cir. 2005).  Expert testimony of this kind is "sometimes excluded on the ground that it

'usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law.'"  *Id.* (citation omitted).  Expert testimony is also not proper "when the purpose of the testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based."  *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988).  Thus, "[w]hile testimony on ultimate facts is authorized under Rule 704 . . . testimony on ultimate questions of law is not favored."  *Id.* at 808.  Such testimony circumvents the jury's decision-making function by "telling it how to decide the case."  *Id.*  Rathbun's proffered opinion that CBRE committed "gross violations" of the Listing Agreement not only expresses a legal conclusion, but the opinion impermissibly invades the province of the jury by telling the jury what result to reach.  *See Gianfrancisco*, 2012 WL 2890916, at *4; *United States Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1150 (10th Cir. 2009).  Accordingly, Rathbun may not opine that CBRE committed violations of the Listing Agreement.

Given Rathbun's substantial experience in commercial real estate in Colorado, the Court finds that he is qualified to opine on whether CBRE's conduct complied with industry standards for commercial real estate brokers.  The Court will not exclude Rathbun's opinions about whether CBRE's conduct was, or was not, consistent with the NAR Standards or the CAR Standards on the basis of Rathbun's qualifications, although there is a separate issue about whether these opinions have any relevance.

CBRE seeks to exclude Rathbun's opinion that the buyer, SCC, was in default.  Docket No. 106 at 5.  CBRE cites to the portion of Rathbun's report where Rathbun concludes that SCC "was in default of a number of terms, conditions[,] and deadlines."  Docket No. 106-2 at 4.  This opinion is a legal conclusion that Rathbun is not qualified to

provide.  Although Rathbun may be qualified to opine whether, based on his review of

the materials, *see* Docket No. 106-2 at 2, SCC met deadlines or made payments, for

instance, Rathbun, who has no legal training, may not offer an opinion of whether

SCC's conduct constituted "default."  Rathbun appears to be using "default"

synonymously with "breach" to opine that SCC breached terms and conditions of the

purchase agreement with plaintiff; he concludes that SCC's default "would have

provided the [plaintiff] with justification for terminating the [c]ontract."  *Id.* at 4.  A

conclusion that SCC defaulted on the terms of the purchase agreement with plaintiff –

or breached that agreement – and the effect of that default or breach would

impermissibly invade the province of the jury by telling the jury what result to reach.

*See Gianfrancisco*, 2012 WL 2890916, at *4.  Rathbun, therefore, may not testify that

SCC was in default of the purchase agreement.

### 2.  *Reliability of Rathbun's Opinions*

CBRE argues that certain of Rathbun's opinions are not reliable.  Docket No. 106

at 5–8.  CBRE identifies three opinions that it believes the Court should exclude: (1)

"CBRE should have not only advised [plaintiff] to seek legal advice, but should have

'insist[ed] upon [plaintiff] getting legal counsel,'" *id.* at 6 (quoting Docket No. 106-2 at 3);

(2) "CBRE had 'an obligation to bring an attorney into this matter,'" *id.* at 7 (quoting

Docket No. 106-2 at 5); and (3) "had an attorney been brought into the loop on behalf of

[plaintiff], this transaction would not have been completed and [plaintiff] would not have

lost his property or funds" *id.* (quoting Docket No. 106-2 at 4).  The Court need not

determine the reliability of these opinions because they are irrelevant.  The Court

granted summary judgment for CBRE on the issue of whether it complied with its

obligations under the Listing Agreement to advise plaintiff to seek legal or tax counsel. *See generally* Docket No. 120.  No testimony on whether CBRE should have insisted that plaintiff retain an attorney or whether CBRE had an obligation to retain an attorney on plaintiff's behalf would "assist the trier of fact to understand or determine a fact in issue."  *See Muldrow*, 19 F.3d at 1337; *Norris*, 397 F.3d 884; *Garcia*, 635 F.3d at 476. The Court will therefore exclude these opinions.

### 3.  Helpfulness of Rathbun's Opinions to the Jury and Risk of Undue Prejudice to CBRE

CBRE argues that certain of Rathbun's opinions are not helpful to the jury under Rule 702 and the opinions' low probative value is substantially outweighed by the risk of undue prejudice to CBRE under Rule 403.  Docket No. 106 at 8–11.  CBRE identifies two categories of opinions that it believes should be excluded.  First, Rathbun offers opinions concerning CBRE's compliance with the NAR Standards and the CAR Standards.  CBRE does not identify specific opinions, which the Court's Practice Standards require.  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.G (requiring that a Rule 702 motion "shall identify with specificity each **opinion** the moving party seeks to exclude").  CBRE, however, argues that Rathbun cites to the NAR Standards and CAR Standards throughout his reports and "intermingle[s] his opinions as to the provisions of the Listing Agreement and these industry codes in reaching his conclusions as to whether CBRE breached its duties to" plaintiff.  Docket No. 106 at 9.  CBRE is correct that Rathbun cites the industry standards throughout his reports, as he concludes are that CBRE "deviated from its standard of care and breached its contractual duties" to plaintiff.  *See* Docket No. 106-2 at 3.  Rathbun concludes, for instance, that CBRE violated "Article 1-5 of the NAR

Standards and Section 6.1 of the Listing Agreement," "section 5.1.4 of the Listing Agreement and Article 13 of the NAR Standards," and "Article 2 of the NAR Standards." *Id.*

CBRE argues that the industry standards "are neither part of the Listing Agreement, nor codified in Colorado law," and may establish obligations that "may be higher than those mandated by law."  Docket No. 106 at 9.  As a result, CBRE believes that testimony about the NAR Standards and CAR Standards would "confuse the issues by adding an additional layer of industry codes that are not reflective of the duties actually imposed upon CBRE," since Rathbun intermingles opinions about industry standards with those about the Listing Agreement.  *Id.* at 10.

Rathbun's report and plaintiff's response both use the phrase "standard of care," and Rathbun opines that opinion that CBRE "deviated from its standard of care."  *See* Docket No. 106-2 at 3, 6; Docket No. 111 at 1–2, 4–5, 7–11.  Phrases like "standard of care" and citation to industry standards of care to determine the appropriateness of party's conduct are most relevant in negligence cases, where a party may owe another party a duty of care that may be based on an industry standard.  *See, e.g.*, *Travelers Indem. Co. v. Hans Lingl Anlagenbau Und Verfahrenstechnik GMBH & Co. KG*, 189 F. App'x 782, 786 (10th Cir. 2006) (unpublished) (noting that industry standards may be relevant to issues of negligence).  Plaintiff argues that Rathbun uses the NAR Standards and CAR Standards "as support for his conclusions regarding the standard of care required, providing context rather than attempting to supplant or distort the contractual duties expressly required in the Listing Agreement."  Docket No. 111 at 9. Rathbun's report indicates otherwise.  Rathbun's report is organized in five "items" or

observations.  *See* Docket No. 106-2 at 3–5.  All but two of Rathbun's observations

begin with a quotation from a NAR Standard and a Listing Agreement clause and then

the observation has a brief opinion of why CBRE's conduct deviated from that standard

and duty.  The Court agrees with CBRE that testimony on CBRE's compliance or

deviation from NAR Standards or CAR Standards presented alongside the Listing

Agreement would have little to no probative value, especially given that the standards

may differ from those mandated by law, and could confuse or mislead the jury.

Whatever probative value the opinions may have would be substantially outweighed by

undue prejudice to CBRE.  These opinions will be excluded under Rule 403, which

provides that "[t]he court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of . . . confusing the issues [or] misleading the

jury."  *See, e.g.*, *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, 445 F. Supp. 3d

1327, 1333 (D. Colo. 2020) (excluding evidence under Rule 403 because it could

confuse or mislead the jury).

Moreover, plaintiff provides no authority that standards of care are relevant to

contract cases.  Contract interpretation is a question of law for the Court.  *See, e.g.*,

*Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1080 (10th Cir.

2001) ("In general, the interpretation of a contract is a question of law." (citing *Pepcol*

*Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984)).  Industry standards

could, in rare circumstances, help provide context for the Court's interpretation of an

ambiguous term of a contract, but no party argues that any provision of the Listing

Agreement is ambiguous.  Even if a party made that argument, the Court would decide

whether the Listing Agreement actually is ambiguous and then the Court, not Rathbun,

would interpret the Listing Agreement.  *See id.* ("Whether an ambiguity exists is also a question of law." (citing *Pepcol*, 687 P.2d at 1314)).  Although plaintiff cites four cases in which courts considered industry standards, *see* Docket No. 111 at 9–10, all of those cases were negligence cases.  In none of those cases did the factfinder consider industry standards to determine whether a party breached a contract.

The Court concludes that, if the NAR Standards or CAR Standards were not incorporated into the Listing Agreement, testimony on those standards would not only confuse the jury because it would be irrelevant to CBRE's contractual duties, it would also be an improper instruction on the law.  *See* 4 Jack B. Weinstein et al., *Weinstein's Fed. Evid.* § 702.03[3] (supp. 2019) ("[E]xpert testimony is not admissible to inform the trier of fact as to the law that it will be instructed to apply to the facts in deciding the case.").  If the NAR Standards and CAR Standards were incorporated into the Listing Agreement, it is not clear why Rathbun would need to cite those standards, since the Listing Agreement would reflect the standards already.  Testimony on what those standards say or mean would be testimony about what the Listing Agreement says or means, which would be contract interpretation.  *See, e.g.*, *Bethel v. Berkshire Hathaway Homestate Ins. Co.*, No. 17-cv-01456-CMA-KLM, 2022 WL 1037572, at *4 (D. Colo. Apr. 1, 2022) ("With respect to Mr. Sands's proffered opinion about what the policy says, the Court agrees that Mr. Sands may not offer an opinion that amounts to contract interpretation.").

Courts have reached similar conclusions, especially where, as here, the contractual terms are not technical or complex.  *See, e.g.*, *Auto-Owners Ins. Co. v. Csaszar*, No. 15-cv-02318-CMA-KMT, 2017 WL 5188338, at *6 (D. Colo. Jan. 26,

2017), *aff'd*, 893 F.3d 729 (10th Cir. 2018) ("Industry standards are likewise not relevant to this Court's determination of whether the Exclusion Provision unambiguously or justifiably excluded Defendant from coverage.  The facts in the case are undisputed and the contractual terms are not complex or technical." (citing *MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 468 F. App'x. 816, 821–22 (10th Cir. 2012) (unpublished) (affirming a trial court's decision to permit an expert to testify about contract interpretation where the expert addressed "intricate arrangements and technical tax jargon" that was helpful to the jury's lay understanding but "never told the jury what legal standards applied or which interpretation was correct as a matter of law [and] specifically disclaimed any attempt to interpret the contract for the jury"))); *Wingerter v. Gerber*, No. 09-cv-02000-PAB-MEH, 2011 WL 441478, at *3 (D. Colo. Feb. 8, 2011) ("Plaintiffs contend that Mr. Segal's testimony [on his knowledge and experience relating to what is 'customary' in his field of expertise] will permissibly assist the jury in understanding matters such as complex legal documents, specialized legal concepts or terms, and custom and practice in the area with which the expert is familiar.  The documents at issue, however, are not complex.  They are relatively short documents describing simple transactions.  Moreover, Mr. Segal does not purport to interpret terms of art." (citation and quotation omitted)); *Salopek ex rel. Salopek Fam. Heritage Tr. v. Zurich Am. Life Ins. Co.*, 2020 WL 6384250, at *11 (D.N.M. Oct. 30, 2020) ("Similarly, the reasonableness of [d]efendant's actions under industry standards is also irrelevant. The sole remaining claim in this case is a breach of contract claim.  The Court dismissed [p]laintiff's bad faith claim, which is a tort claim."); *Stan Clauson Assocs., Inc. v. Coleman Bros. Const., LLC*, 297 P.3d 1042, 1048 (Colo. App. 2013) ("[A]n expert's

opinion as to the best practices and ethics of a type of service does not necessarily establish a legally enforceable duty of care independent of the applicable service agreement. . . .  Accordingly, we conclude that the AICP code does not establish a legal duty or an enforceable standard of care independent of those in the agreement."). Rathbun, therefore, may not testify about industry standards.

Second, CBRE argues that Rathbun's opinions that (1) CBRE was negligent, (2) "let [its] client down and failed to uphold [its] obligations under the Listing Agreement," and (3) did not provide the level of service that CBRE advertises in its marketing materials are irrelevant because plaintiff has no negligence or misrepresentation claim against CBRE.  Docket No. 106 at 11 (quoting Docket No. 106-3 at 5).  The Court agrees.  Testimony that CBRE was negligent, let plaintiff down, or did not provide the level of service that its marketing materials advertise would not be relevant to plaintiff's claim that CBRE breached the Listing Agreement in not keeping plaintiff informed or disclosing material adverse facts that CBRE knew.  As discussed previously, testimony that CBRE "failed to uphold [its] obligations under the Listing Agreement," *see* Docket No. 106 at 11 (quoting Docket No. 106-3 at 5), is inadmissible because it invades the province of the jury by telling the jury what result to reach.  *See Gianfrancisco*, 2012 WL 2890916, at *4.  The Court, therefore, will not permit Rathbun to provide these opinions to the jury.  Because the Court has found that each of Rathbun's opinions that CBRE identified is inadmissible, the Court will grant CBRE's motion.

### B.  SCC's Motions to Exclude Testimony of Craig Rathbun and Robert Neirynck

SCC seeks to exclude testimony from Rathbun and plaintiff's expert Robert Neirynck, who is plaintiff's financial expert.  *See generally* Docket Nos. 108, 110.  As an

initial matter, SCC's motions fail to fully comply with the Court's Practice Standards because the motions do not identify specific opinions that SCC asks the Court to exclude.  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.G.  While SCC notes the "scope" of Rathbun's and Neirynck's reports and lists various opinions that each expert provided in his respective report, *see* Docket No. 108 at 4–5; Docket No. 110 at 4, 11, SCC does not necessarily identify these opinions as the ones it seeks to exclude under Rule 702.  *See id.*  Moreover, SCC improperly seeks to exclude the entirety of Rathbun's and Neirynck's testimony, rather than opinions that SCC believes are improper.  *See* Docket No. 108 at 10 (requesting "an order striking Craig Rathbun as an expert, and the Rathbun expert report in its entirety"); Docket No. 110 at 13 (requesting "an order striking Robert Neirynck as an expert, and the Cordes Report in its entirety").

Although SCC's motions broadly seek to exclude the experts based on the experts' qualifications and the methodologies the experts applied, Rule 702 is not focused on the wholesale inclusion or exclusion of an expert.  Rather, as the Practice Standards require, Rule 702 focuses on whether opinions are admissible.  An expert must be qualified to render each opinion, and each opinion must be the product of a reliable methodology that was properly applied.  *See, e.g.*, *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-cv-01301-PAB-GPG, 2020 WL 2839302, at *3 (D. Colo. June 1, 2020) (declining to consider motion to exclude categories of opinions and noting that the purpose of the Practice Standard is to focus the analysis on specific opinions since the "burden is on [the moving party] to identify the specific opinions it seeks to exclude" (quoting *Chateau Village N. Condo. Ass'n v. Am. Family Mut. Ins.*

*Co.*, No. 14-cv-01583-PAB-NYW, 2016 WL 1444626, at *3 (D. Colo. Apr. 13, 2016)). The Court will construe SCC's motions as challenges to those opinions that its motions reasonably identify.

### 1.  Craig Rathbun

SCC identifies opinions in Rathbun's initial report and deposition regarding SCC's conduct in this transaction, which opinions SCC argues Rathbun is not qualified to provide and which are not the product of a reliable methodology.  *See* Docket No. 108 at 7–10.

### a.  Rathbun's Qualifications

SCC argues that Rathbun is not qualified to opine on "forensic accounting and financial calculations" issues regarding the sale of the Property or on "the structure of seller carry back financing" and "the flow of funds."  Docket No. 108 at 7–9.  These are not "specific opinions," *see RCHFU*, 2020 WL 2839302, at *3; however, there is no dispute that Rathbun is not a forensic accountant or CPA and that he did not complete his undergraduate degree in business.  *See* Docket No. 108 at 4; *see generally* Docket No. 112.  The Court will not repeat the relevant points of Rathbun's biography and CV.

The only specific opinion that SCC argues Rathbun is not qualified to provide is his conclusion that plaintiff "was in an increasingly precarious position relative to its ability to recover the funds for the Seller Carry, and that [SCC's] lender was also being duped with the aid of [SCC]."  Docket No. 108-3 at 6.  Although the Court agrees with SCC that Rathbun would not be qualified to opine on forensic accounting matters, as there is no indication that Rathbun has any experience in forensic accounting, SCC has not shown why the opinion that it identifies about plaintiff's financial position or SCC's

19

interaction with its lender requires such expertise.  Moreover, although SCC notes that Rathbun is not a "certified fraud examiner," a "valuation expert," or an attorney, Docket No. 108 at 8, SCC has also not shown why any of these qualifications are necessary to provide an opinion about plaintiff's financial position or SCC's relationship with its lender.  Given Rathbun's experience in commercial real estate transactions, including in seller financing, such as in this transaction, *see* Docket No. 112-3 at 23, 314:16–22, the Court finds Rathbun qualified to opine on plaintiff's general financial position, the seller-carry agreement, and the interplay between SCC, its lender, and plaintiff.[1]  *See Medina-Copete*, 757 F.3d at 1104; *Ralston*, 275 F.3d at 970; *Squires*, 829 F. Supp. at 1048. The Court does not find the fact that Rathbun did not finish college to be disqualifying because experts may derive qualifications from knowledge, skill, and experience, not just formal training or education.  *See Gould*, 2021 WL 4428286, at *3.

Rathbun, however, may not testify that SCC "duped" its lender.  Rathbun does not show how SCC's conduct with its lender is relevant to plaintiff's claims against CBRE.  Even if the opinion could be relevant to plaintiff's claims, any relevance would be substantially outweighed by the undue prejudice to SCC of Rathbun's use of the term "dupe."  The Court will therefore exclude the opinion, "[SCC's] lender was also being duped with the aid of [SCC]," under Rule 403.  *See RCHFU*, 445 F. Supp. 3d at 1333.

### c.  Rathbun's Methodologies

---

[1] SCC asks the Court to "strike from the Rathbun Report any opinion" on "structure of seller carry back financing, the flow of funds, and forensic accounting in the commercial real estate sector," Docket No. 108 at 8, but SCC identifies no specific opinion it believes is inadmissible under Rule 702.

SCC argues that Rathbun did not apply a proper methodology.  Docket No. 108 at 5, 9–10.  SCC identifies two specific opinions that it argues are the product of unreliable methodology: (1) Rathbun's testimony at his deposition that the transaction involved elements of "con[ning]" or "steal[ing]," *id.* at 9 ("At his deposition, Mr. Rathbun refers to [SCC's] conduct as the buyer in the transaction as involving 'con' and 'steal.'"); and (2) Rathbun's opinion that plaintiff "was in an increasingly precarious position relative to its ability to recover the funds for the Seller Carry, and that [SCC's] lender was also being duped with the aid of [SCC]."  Docket No. 108-3 at 6.

A district court has "broad discretion" to decide "how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge*, 328 F.3d at 1223; *Kumho Tire*, 526 U.S. at 153 ("[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").  However, the Court's role as a gatekeeper does not extend to determining whether an expert is correct.  *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) ("a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions"); *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (a plaintiff "need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community" in order to establish the admissibility of the expert's opinion under Rule 702 (quotation omitted)); *Squires*, 829 F. Supp. 2d at 1055 ("the court's 'gatekeeping' responsibilities under Rule 702 do not turn on the 'correctness' of an expert's opinions"); Wright et al., 29 *Fed. Prac. &*

21

*Proc. Evid.* § 6262 (2d ed. 2022) ("The judge is charged with looking for objectively provable earmarks of reliability that can be evaluated by a non-expert.  The judge is not asked to decide if the expert's opinions are, in fact, scientifically or technically correct since this is more than one trained in the law could be expected to do.  Assuming the expert testimony has the earmarks of reliability, the evidence is then admitted and subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and which witnesses to believe.").

Rathbun's report states that he reviewed various materials, including the complaint, various exhibits, standards of practice and ethics for commercial brokers, plaintiff's contract with CBRE, and the deposition of a CBRE broker who worked on the transaction.  Docket No. 108-2 at 2.

The Court has already excluded the first opinion that SCC argues is inadmissible, i.e., that SCC stole or conned plaintiff, and the portion of the second opinion that SCC duped its lender are inadmissible under Rule 403.  Accordingly, the Court does not reach the issue of whether those opinions were the product of reliable methodology.

Rathbun's report does not provide adequate methodology for the portion of second opinion that plaintiff "was in an increasingly precarious position relative to its ability to recover the funds for the Seller Carry."  Docket No. 108-3 at 6.  The only clear explanation for this opinion is Rathbun's note of the "last-minute changes to the [c]ontract and flow of funds for the [c]losing."  *Id.*  Rathbun, however, does not explain how the last-minute proposed changes to the contract means that plaintiff's ability to recover was precarious.  In response to SCC's motion, plaintiff does not explain the methodology that Rathbun employed to reach this opinion.  Assuming this Rathbun

relies solely on his experience for this conclusion, he has not explained "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *See Medina-Copete*, 757 F.3d at 1104.  Because there is no indication what methodology Rathbun used to reach this portion of the opinion, the Court is not able to determine whether Rathbun's methodology was reliable.  *See* Fed. R. Evid. 702 (the court must determine whether the testimony is the "product of reliable principles and methods" and whether the expert "reliably applied the principles and methods to the facts of the case"); *see also Bitler*, 400 F.3d at 1239; *Joiner*, 522 U.S. at 146; *Erickson v. City of Lakewood*, No. 19-cv-02613-PAB-NYW, 2021 WL 4438035, at *14 (D. Colo. Sept. 27, 2021).  Because the Court is unable to assess whether this opinion is the "product of reliable principles and methods," *see* Fed. R. Evid. 702(c), the Court will exclude this opinion.  Because all of the opinions that SCC identified are inadmissible, the Court will grant SCC's motion.

### 2.  Robert Neirynck

Plaintiff disclosed Robert Neirynck as its expert on plaintiff's damages, SCC's financial activity, and the financial condition of the Property under SCC's control and management.  Docket No. 106-1 at 2–3.  Neirynck is a "financial, accounting[,] and operational professional," who works in the areas of "receivership, loan default assessment, bankruptcy matters, economic damage reviews and general forensic accounting."  Docket No. 110-3 at 25.

### a.  Neirynck's Qualifications

SCC concedes that Neirynck "may assist the jury in understanding the facts in evidence by discussing a specific fact question in the context of an industry standard"

and "may permissibly apply the facts of this case to general accounting industry standards to opine whether [defendant's] conduct violated those standards."  Docket No. 110 at 7.[2]

As the Court has explained, an expert may be qualified based on his knowledge, skill, experience, training, or education, *see Gould*, 2021 WL 4428286, at *3–4, and, "as long as an expert stays within the reasonable confines of his subject area, . . . case law establishes a lack of specialization does not affect the admissibility of the expert opinion, but only its weight."  *Ralston*, 275 F.3d at 970.  Expertise is not an overly rigorous requirement.  *Gould*, 2021 WL 4428286, at *4; *Squires*, 829 F. Supp. 3d at 1048.

SCC identifies three opinions that it believes Neirynck is not qualified to give at trial and that are not relevant.  Docket No. 110 at 9–10.  First, "we noted that the transactions involving the seller carryback note of $1,140,000 were very odd."  *Id.* at 9.  Second, "on the surface of settlement statements, make it appear as though SCC . . . is funding $1,144,625 of the purchase price of the Property when, in fact, SCC only contributed $4,625 at the time of closing."  *Id.*  Third, "the flow of funds through the sale closing process that ultimately gave rise to the $1,140,000 promissory note from SCC . . . to [plaintiff] was putting more money into the Property than it actually was."  *Id.* at 9–10.

---

[2] SCC, however, argues that Neirynck is not qualified to opine on whether SCC damaged plaintiff by defaulting, whether SCC was unjustly enriched, whether SCC made promises to plaintiff regarding the parties' agreements, and whether the structure of the transaction complied with industry standards.  *Id.*  Neirynck, however, does not address most of these matters.  *See generally* Docket No. 110-3.

SCC asserts that Neirynck is not qualified to provide these opinions because Neirynck is not a certified fraud examiner, an expert in valuing commercial real estate property, an expert in brokerage services, or a member of NAR.  *Id.* at 8.  SCC also argues that Neirynck is not qualified because he has never testified in seller carryback financing cases, is not a member of the Association of Certified Fraud Examiners, and did not study "real estate finance, real estate law, real estate investment law, real estate valuation or investment, and real estate development."  *Id.*

Neirynck's report states that he is a "financial, accounting and operational professional who works on and manages many of the firm's engagements in the areas of receivership, loan default assessment, bankruptcy matters, economic damage reviews and general forensic accounting."  Docket No. 110-3 at 25.  Neirynck has "managed and been involved with over 165 of [his] firm's receivership matters[,] including [in] loan defaults, commercial foreclosures, liquidations, and partnership/owner disputes" and has "managed and/or played significant roles in many of the firm's bankruptcy related engagements, especially with respect to the financial and accounting aspects."  *Id.*  He also was an audit manager with Ernst & Young for seven years, where he worked on GAAP audits.  *Id.*

SCC provides no explanation why an expert witness must be a certified fraud examiner, an expert in valuing commercial real estate property, an expert in brokerage services, and a member of NAR in order to give the opinions SCC finds objectionable, which do not involve real estate valuation or brokerage services.  SCC also does not explain why membership in NAR would qualify a witness to provide the opinions that SCC seeks to exclude.  Neither does SCC argue, for instance, that those qualifications

are commonly held by experts providing similar opinions.  Although the report does not

detail Neirynck's real estate experience, his company biography indicates substantial

experience in defaults, foreclosures, and audits.  While it is the proponent of the

expert's burden to establish the admissibility of the expert's testimony, *see, e.g.*, *United

States v. Nacchio*, 555 F.3d 1234, 1244 (10th Cir. 2009), an opponent may not simply

assert that the expert is unqualified without providing some basis for the Court to reach

that conclusion.  *Cf. A-W Land Co., LLC v. Anadarko E&P Co. LP*, No. 09-cv-02293-

MSK-MJW, 2017 WL 4161278, at *2 (D. Colo. Sept. 20, 2017) ("Generally speaking, a

successful Rule 702 challenge requires the party asserting it – the party opposing the

admission of the opinion – to support the challenge with evidence obtained from

someone other than the challenged expert.").  Plaintiff has shown that Neirynck is

qualified to give the three opinions that SCC identifies, and SCC has provided no basis

for the Court to find otherwise.  The Court finds that Neirynck is qualified to provide

these opinions because these opinions are "within the reasonable confines" of

Neirynck's expertise, and his possible lack of specialization does not affect the

admissibility of these particular opinions.  *See Ralston*, 275 F.3d at 970 ("[A]s long as

an expert stays within the reasonable confines of his subject area, our case law

establishes a lack of specialization does not affect the admissibility of the expert

opinion, but only its weight.").  For this reason, the Court also finds unpersuasive SCC's

argument that Neirynck is not qualified because he has never testified in a case "related

to seller carry back financing."  Docket No. 110 at 8.  "The relevant expertise under Rule

702 is the subject matter in which the witness holds specialized knowledge, not the skill

or experience a witness has in testifying or working with lawyers." *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 925 (D. Colo. 2017).

SCC argues that the Court should preclude Neirynck from testifying because he had some of his testimony excluded in a New Mexico state court case. Docket No. 110 at 8–9. SCC does not explain the circumstances of this ruling, but attaches the court's order. *See* Docket No. 110-4. The court precluded Neirynck from testifying "beyond the scope of his expertise," *id.* at 2, but permitted him to "testify and offer opinions that he reached as a result of the forensic accounting analysis that he performed," including regarding the defendants' resources and whether those resources were sufficient to cover the defendants' obligations. *Id.* Given that no expert may testify outside the scope of his expertise, *see* Fed. R. Evid. 702, 703, the New Mexico state court order does not provide any basis to exclude Neirynck's testimony in this case.

SCC further seeks to exclude Neirynck's testimony because he testified that his membership in the American Bankruptcy Institute and Turnaround Management Association "would not equip him with the professional expertise to opine on the structure of a commercial real estate transaction at a county level in the State of Colorado." Docket No. 110 at 9. Neirynck agreed that his membership in "those two organizations" would not qualify him to render an opinion on "real estate brokerage services," which is not relevant to his testimony here, or the "structure of a commercial real estate transaction." Docket No. 110-1 at 16, 53:3–17. SCC makes much of Neirynck's agreement that membership in the American Bankruptcy Institute and Turnaround Management Association would not alone qualify him to opine on the structure of a commercial real estate transaction, but in so doing SCC fails to account

for Neirynck's other qualifications and experience, which do provide sufficient expertise. Thus, the fact that Neirynck's membership in two organizations would not, by itself, qualify him to opine on commercial real estate transactions does not mean that he is unqualified to provide such opinions in light of his other experience.

Finally, SCC argues that Neirynck is not qualified because he "admitted that real estate brokerage services contained in [the] . . . engagement letter . . . was more pertinent to the expertise of his colleague," who was a real estate broker, yet Neirynck, not his colleague, prepared the report. Docket No. 110 at 9. SCC, however, identifies no specific opinion about real estate brokerage services that it believes Neirynck is not qualified to provide. Accordingly, the Court finds that Neirynck is qualified to provide the three specific opinions that SCC has identified.

SCC argues that these opinions are also irrelevant to the "material matters to be decided" in this lawsuit. Docket No. 110 at 10. Although an SCC does not elaborate on this argument, in ruling on a Rule 702 motion, the Court has a "gatekeeper function" to ensure that testimony is relevant. *Gabaldon*, 389 F.3d at 1098; *Kumho Tire*, 526 U.S. at 152; *Garcia*, 635 F.3d at 476. Plaintiff's remaining claims against SCC are for breach of the promissory note and bad check. For its claim that SCC breached the promissory note, plaintiff alleges that the SCC signed a promissory note for $1,140,000.00, but SCC failed to make the required payments. Docket No. 35 at 8, ¶¶ 41–44. The three opinions are all relevant to SCC's performance under the note. The first and third opinions discuss the note directly; the first is Neirynck's opinion about the transactions involving the note, and the third concerns the flow of funds from SCC to plaintiff that "gave rise to" the note. Docket No. 110 at 9–10. Although the second opinion does not

mention the note explicitly, the opinion appears in a sentence of Neirynck's report that says, "on the surface of the settlement statements, make it appear as though SCC is funding $1,144,625 of the purchase price of the Property when, in fact, SCC only contributed $4,625 at the time of closing because the other $1,140,000 was financed through a seller carryback note."  Docket No. 110-3 at 4.  The third opinion, therefore, is also relevant to plaintiff's claim that SCC breached the promissory note.

### b.  Neirynck's Methodologies

SCC argues that Neirynck applied a methodology that is not generally accepted in forensic accounting or real estate valuation.  Docket No. 110 at 10–13.  As the Court noted with respect to Rathbun's methodology, the Court has broad discretion to determine an expert's reliability, *Dodge*, 328 F.3d at 1223; *Kumho Tire*, 526 U.S. at 153, but the Court's gatekeeping responsibility does not include a determination of whether the expert is correct.  *Bitler*, 400 F.3d at 1233; *Mitchell*, 165 F.3d at 781.  Plaintiff does not explain what Neirynck's specific methodology was, but the report states that he communicated with plaintiff to gain an understanding of the litigation, the available documents, and the financial and accounting issues; reviewed the available documents relating to SCC's financial activity and condition, including the SCC note payable to plaintiff and the sale of the Property, including bank statements, real estate related closing or sale documents, loan documents, and other financial related documents; and then performed various financial and other analyses related to SCC's financial activity. Docket No. 110-3 at 2.

The only specific opinions that SCC identifies as methodologically unsound are: (1) "presumably [SCC] was [likely] in default of its mortgage obligations during most of

the period"; (2) "it is presumed that any Property refinancing funds were deposited into M. Kaminski's personal account or one of his other LLC accounts for which we had no access"; and (3) "there appears to be commingling of funds and financial activity with Kaminski's other entities primarily K Capital."  Docket No. 110 at 11.  SCC does not explain why those three specific opinions, as opposed to others, are based on an unreliable methodology.

SCC argues that Neirynck's methodology is unreliable for three reasons.  First, although not presented as a methodological argument, SCC notes that Neirynck did not consider certain information in drafting his report, such as the Court's order on SCC and Kaminski's motion to dismiss, SCC and Kaminski's answer, Federal Rule of Civil Procedure 30(b)(6) deposition transcripts, plaintiff's discovery demands, and SCC and Kaminski's discovery responses.  *Id.* at 4–5.  SCC also argues that Neirynck did not interview plaintiff's corporate representatives.  *Id.* at 5.  Although Neirynck conceded that he could have provided more fulsome opinions if he had more information, SCC does not explain why the particular information that Neirynck did not review was crucial to Neirynck reaching the three conclusions that SCC identifies.  In addition, SCC does not explain why it would be appropriate for Neirynck, who is not an attorney, to base his opinions on the Court's order, or why an expert providing an opinion on accounting and financial issues necessarily would need to review deposition testimony.

Second, SCC argues that Neirynck did not "make reference and/or cite to" the Statement and Standards for Forensic Services ("SSFS") in the body of his report.  *Id.* at 10.  Neirynck explained the SSFS are "foundational standards" that discuss "how CPAs approach doing litigation services," such as "due diligence and reasonable care."

30

Docket No. 110-1 at 11–12, 36:5–37:15.  He further explained that the SSFS require the CPA to "review the evidence," "have solid conclusions," base their conclusions on "reasonable assumptions," and "consider relevant supporting documentation and the facts."  *Id.* at 12, 37:4–21.  SCC does not explain why making "reference and/or cit[ing] to" the SSFS is necessary for a reliable report if a CPA follows the SSFS standards.

Third, SCC argues that, because the SSFS require a "member" providing forensic services to base his report on "sufficient relevant data," Neirynck's "lack of financial and accounting data shaped" his conclusions, such as the three opinions that SCC identifies.  Docket No. 110 at 11.  The report, however, explains that Neirynck was provided with "limited financial and accounting documents relative to SCC" and states that, if Neirynck were provided with additional information, such as accounting records for SCC, "other financial issues may have come to [his] attention regarding SCC's finances."  Docket No. 110-3 at 4.  Thus, the report explains its limitations and Neirynck's opinions appear to be based on the most complete information that was available.  Neirynck testified that he asked plaintiff's counsel for additional documents, but plaintiff's counsel said the documents "didn't exist," and Neirynck presumed that was correct.  Docket No. 110-1 at 61, 184:17–20.  Neirynck thus based his opinion on the information provided.

However, the Court, exercising its "gatekeeper" function, *see Gabaldon*, 389 F.3d at 1098, finds that the second opinion is based on Neirynck's "subjective belief or unsupported speculation."  *See Mitchell*, 165 F.3d at 780; *Joiner*, 522 U.S. at 146.  The second opinion is that "it is presumed that any Property refinancing funds were deposited into M. Kaminski's personal account or one of his other LLC accounts for

31

which we had no access." *See* Docket No. 110-3 at 9.  The report explains, "we were not provided with a settlement statement or other documents to determine the net payout to SCC, but presumably SCC received some funds from the refinancing. Nonetheless, we were unable to identify any funds received from the refinancing in any of the available bank statements." *Id.*  Neirynck's report does not explain why he concluded that funds "were deposited into M. Kaminski's personal account or one of his other LLC accounts," given that Neirynck did not have access to those accounts.  This assumption regarding where the refinancing funds went is speculation that is not "connected to existing data" by any more than Neirynck's *ipse dixit*.  *See Joiner*, 522 U.S. at 146.  Accordingly, he may not provide this opinion at trial.

The third opinion is that "there appears to be commingling of funds and financial activity with Kaminski's other entities primarily K Capital."  Docket No. 110 at 11. Although there are no claims against Kaminski or K Capital, Neirynck's opinion about whether Kaminski comingled funds could be relevant to the jury's understanding of K Capital as the predecessor of SCC.  Similarly, although there are no longer claims against Kaminski, testimony about his financial activity could be relevant to the jury's understanding of plaintiff's remaining claims.[3]

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant CBRE, Inc.'s Motion to Exclude Expert Testimony of

---

[3] The first opinion is that "presumably [SCC] was [likely] in default of its mortgage obligations during most of the period."  *Id.*  The report explains that Neirynck reached this conclusion after examining SCC's bank statements, where he found that, although "a few mortgage payments were made," Kaminski did not continue to make mortgage payments.  Docket No. 110-3 at 6.  That opinion is relevant and not speculative.

Craig B. Rathbun [Docket No. 106] is **GRANTED**.  It is further

      **ORDERED** that Defendants Stone Creek–Colorado, LLC and Mikhail Kaminski's Motion to Disqualify the Plaintiff's Expert Craig Rathbun Pursuant to Fed. R. Evid. 702 and Fed. R. Evid. 703 [Docket No. 108] is **GRANTED**.  It is further

      **ORDERED** that Defendants Stone Creek–Colorado, LLC and Mikhail Kaminski's First Amended Motion to Disqualify the Plaintiff's Expert Robert Neirynck Pursuant to Fed. R. Evid. 702 and Fed. R. Evid. 703 [Docket No. 110] is **GRANTED in part** and **DENIED in part**.

      DATED September 23, 2022.

                        BY THE COURT:

                        PHILIP A. BRIMMER
                        Chief United States District Judge